**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **J.T. and C.H.**

**No. 21-0136** (Raleigh County 18-JA-228-D and 18-JA-229-D)

**MEMORANDUM DECISION**

Petitioner Grandmother S.D. and Petitioner Step-grandfather T.B., by counsel Gavin G. Ward, appeal the Circuit Court of Raleigh County's January 13, 2021, order denying them permanent placement of the children in this case, J.T. and C.H.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and S.L. Evans, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Timothy P. Lupardus, filed a response on behalf of the children in support of the circuit court's order. The children's foster parent, R.J., by counsel Winifred L. Bucy, also filed a response in support of the circuit court's order. On appeal, petitioners argue that the circuit court erred in accepting the DHHR's determination that they failed their home study and denying them permanent placement of the children.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In September of 2018, the DHHR filed a petition against the children's parents alleging significant drug abuse. Relevant to this appeal, the petition included allegations that the parents and the children were found in petitioners' home in violation of a DHHR protection plan and that the mother alleged that a jug of tea in petitioners' home was spiked with methamphetamine,

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

causing her to test positive for the substance.[2] During the proceedings, the circuit court adjudicated the parents as abusing parents and later terminated their parental rights based upon their failure to address their substance abuse. The mother appealed the termination of her parental rights, and this Court affirmed the circuit court's dispositional order by memorandum decision. *See In re J.T.*, No. 20-0151, 2020 WL 5240655 (W. Va. Sept. 3, 2020)(memorandum decision).

At some point, petitioners filed a motion to intervene, which the circuit court granted, and they were added as parties to the case. On October 7, 2020, the circuit court held a permanency review hearing regarding permanent placement of the children. Petitioners presented the testimony of their other daughter and her husband, as well as a family friend. Their testimonies indicated that petitioner S.D. previously cared for J.T. at various times during his life due to the mother's drug abuse. The witnesses testified to petitioner S.D.'s bond with the child, the quality of her caretaking, and her home conditions. Each witness opined that petitioners were appropriate placements and were capable of caring for the children.

Petitioner S.D. testified and requested placement of the children. She stated that she had ceased contact with the children's mother and had not seen her in over a year. Petitioner S.D. testified that she had cared for J.T. frequently prior to the petition's filing due to the mother's drug abuse and that she had a strong bond with the child. Petitioner S.D. stated that she attempted to get placement of the children during the proceedings but that she was denied placement because of petitioner T.B.'s criminal history. Petitioner S.D. acknowledged that petitioner T.B. "messed up" but argued that "everybody deserves a second chance." According to petitioner S.D., petitioner T.B. was convicted of driving under the influence causing death after he was involved in a vehicle accident where two other people were killed. Petitioner S.D. testified that petitioner T.B. no longer drank alcohol and had steady employment, describing him as a "workaholic." Aside from petitioner T.B.'s criminal history, petitioner S.D. stated that neither the CPS worker nor the guardian indicated any barrier to placing the children in their home, and petitioner S.D. further noted that the home was clean and appropriate. Petitioner S.D. also testified that she participated in every visit with the children that she was granted. However, because petitioner S.D. was permitted to attend visits with the mother, her visits ceased when the mother's visits were stopped due to the mother's noncompliance with services.

On cross-examination, petitioner S.D. denied the mother's allegations at the initiation of the case that a jug of tea spiked with methamphetamine was in petitioner S.D.'s house. Petitioner S.D. also denied knowing that there was a safety plan in place at the time of the petition's filing, stating she had not been a part of the plan and, thus, was unaware that she was allegedly in violation of the same. Petitioner S.D. admitted that she allowed the mother to live with her for two or three months during the proceedings while the mother looked for an apartment. Petitioner S.D. stated

---

[2]At the time of C.H.'s birth, the DHHR implemented in-home safety services to protect the children from the parents' drug abuse. Eventually, the parents agreed that the mother and the children would reside in the home of a friend and that the father would not have contact with the children due to his continued drug abuse. However, as noted above, the mother took the children to petitioner's home to meet the father, in violation of their agreement with the DHHR. Although petitioner cared for J.H. at times prior to the petition's filing, she never cared for C.H.

that she did not know that the mother was not in compliance with services at that time because she did not have access to the proceedings.

Petitioner T.B. testified regarding his prior conviction for driving under the influence causing death. Petitioner T.B. stated that he was never disciplined or reprimanded during his incarceration or release on parole, that he discharged his sentence, and that he had no other felony convictions. Petitioner T.B. testified that he no longer consumed alcohol and had stable employment.

The foster mother presented the testimony of an employee of Pressley Ridge, a foster care agency. The employee testified that, at the time the children were removed from the mother's custody, the DHHR sent a referral to Pressley Ridge indicating that the mother, the father, and the children were found in petitioners' home in violation of a safety plan. The employee further noted that the referral contained the mother's report that a jug of tea containing methamphetamine was in petitioners' home. The employee stated that she initiated background checks on petitioners and that "[i]t came back there was a CPS background on [petitioner S.D.], and a criminal background on [petitioner T.B.] for the State of West Virginia." The employee testified that "there was also a CPS record for her in Florida" but that she did not have access to those records.[3] The employee stated that, based on the CPS records and criminal background report, petitioners could not be approved as foster placements. The employee acknowledged that there was a waiver available and testified that the grant of a waiver was considered on a case-by-case basis. However, the employee stated that it was very rare that waivers were granted for "substantial criminal records." The employee testified that a waiver was considered in petitioners' case but was not granted by Pressley Ridge due to petitioner T.B.'s criminal record. On cross-examination, the employee admitted that she did not know whether petitioner S.D.'s Florida CPS record included an "actual substantiation," and simply noted that "it was flagged."

Following testimony, the circuit court continued the hearing, allowing the parties time to submit proposed orders and written recommendations. At the reconvened permanency hearing held in January of 2021, the guardian recommended that the children remain in the care of their foster mother. The guardian stated that petitioners did not pass a home study due to their CPS and criminal history. Further, the children had remained in the foster mother's home since November of 2018, and the youngest child had been placed with her directly at birth. The guardian opined that removing the children from the home would be detrimental to them given the strides they had made in the foster mother's home. Although the guardian noted that petitioners' home was appropriate and that petitioner T.B. was rehabilitated, the guardian opined that the best interest of the children necessitated that they remain in the foster mother's care.

Ultimately, the circuit court adopted the guardian's recommendation and granted permanent placement of the children to the foster mother. The circuit court found that the younger child had never lived with petitioners and that the older child had not lived with them in over two

---

[3]Although the Pressley Ridge employee's statement seems to indicate that petitioner S.D. had a CPS history in West Virginia, a review of the transcript indicates that the background check revealed only the Florida history and at no point did the employee discuss any substantiations in West Virginia.

years, meaning the child had spent twice the amount of time with the foster mother that he had spent in petitioners' home prior to the proceedings. The circuit court further found that it was "amazing how well the children are doing" in the foster mother's care and that the grandparent preference had not been triggered due to the failed home study. The circuit court concluded that it would be detrimental to the children to be removed from the foster mother's care and that it was in their best interests to remain in that placement. Petitioners appeal the January 13, 2021, order denying them placement of the children.[4]

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioners argue that the circuit court erred in accepting the DHHR's determination that petitioners failed a home study without requiring the DHHR to "complete the statutorily mandated home study of [their] home." According to petitioners, multiple issues were raised with their suitability, including an alleged jug of spiked tea in their home, prior CPS involvement, and petitioner T.B.'s felony conviction. Petitioners refute that they ever had methamphetamine-laced tea in their home and further contend that they were not permitted to address these issues during the proceedings below. Petitioners aver that the mother's accusations with regard to the jug of tea were considered early on in the proceedings when they were not parties to the case and, therefore, they were unable to dispute these accusations or cross-examine the mother in that regard. Petitioners also contend that a waiver should have been considered regarding petitioner T.B.'s criminal history given that the guardian opined that he was rehabilitated and that he had no other substantial criminal record. Petitioners further argue that no evidence was presented regarding any prior CPS allegations, which prevented them from defending themselves, and that the DHHR relied on this alleged history, in part, to deny petitioners a proper home study.

Finally, petitioners argue that the circuit court improperly weighed the totality of the circumstances and erred in granting permanent placement of the children to the foster mother. Petitioners distinguish several cases wherein this Court found that the lower court did not err in

---

[4]According to respondents, the permanency plan for the children is adoption in their foster home.

4

granting placement of the children to the foster parents. Petitioners note that, unlike the grandparents in those cases, they sought placement of the children from the beginning of the proceedings and had not and would not allow the children around the parents. Petitioners further argue that there was no expert testimony regarding any negative impacts of placing the children with petitioners over the foster mother, and the guardian described petitioners' home as "great." Petitioners state that, but for the passage of time in the case, the guardian likely would have recommended placement of the children with petitioners.

On this issue, we have previously held that

> [w]hile the grandparent preference statute[5]. . . places a mandatory duty on the West Virginia Department of Health and Human Resources to complete a home study before a child may be placed for adoption with an interested grandparent, "the department shall first consider the [grandparent's] suitability and willingness . . . to adopt the child." There is no statutory requirement that a home study be completed in the event that the interested grandparent is found to be an unsuitable adoptive placement and that placement with such grandparent is not in the best interests of the child.

Syl. Pt. 10, *In re L.M.*, 235 W. Va. 436, 774 S.E.2d 517 (2015) (footnote added). In discussing the grandparent preference, this Court noted that "[t]he preference is just that—a preference. It is not absolute . . . . [T]he child's best interest remains paramount." *In re K.E.,* 240 W. Va. 220, 225, 809 S.E.2d 531, 536 (2018). Simply stated, "[t]he grandparent preference must be considered in conjunction with our long standing jurisprudence that 'the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children.'" *In re Hunter H.*, 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (quoting Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996)).

Petitioners' argument regarding the DHHR's failure to conduct a home study is unavailing given that the DHHR considered placement of the children with petitioners but found their home to be unsuitable. As noted above, the DHHR is absolved of its statutory duty to perform a home study if it finds the grandparent is unfit and placement in the home is not in the children's best interests. *In re L.M.*, 235 W. Va. at 438, 774 S.E.2d at 520, Syl. Pt. 10, in part. Here, the evidence

---

[5]West Virginia Code § 49-4-114(a)(3), the grandparent preference statute, provides as follows:

> For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

established that petitioners had a prior CPS history, as well as a felony criminal conviction, rendering petitioners unsuitable for placement per DHHR policy and absolving the DHHR of its duty to perform a home study. While petitioners spend ample time on appeal refuting any testimony from earlier in the proceedings regarding the alleged spiked jug of tea in their home, the record demonstrates that the circuit court gave little, if any, consideration to this allegation in denying petitioners placement of the children. Rather, the circuit court considered petitioners' prior CPS and criminal history, as well as the children's best interests and the length of time the children spent in the foster mother's home.

Although petitioners state that there was no evidence presented regarding any prior CPS history, the record below demonstrates that an employee from the Pressley Ridge foster agency initiated a background check on petitioners and that the State of Florida reported a CPS history. Petitioners failed to offer any evidence to dispute that they were involved with CPS in Florida or explain that the allegations against them were unsubstantiated. Further, petitioners admitted to petitioner T.B.'s prior felony conviction for driving under the influence causing the deaths of two people and failed to demonstrate that either Pressley Ridge or the DHHR acted arbitrarily or capriciously in denying them a waiver. The Pressley Ridge employee's testimony indicated that a waiver in this case was considered but denied based upon this criminal history and that waivers are rarely granted for felony convictions such as this. As such, petitioner's home clearly was not suitable for the children, and, therefore, the circuit court did not abuse its discretion by not ordering the DHHR to conduct a home study. Moreover, we find no error in the circuit court's determination that permanent placement of the children in the foster mother's home was in their best interests given petitioners' inability to pass a home study, as well as the children's bond with the foster mother, the length of time they had lived in her home, and their substantial progress while in her care.

For the foregoing reasons, we find no error in the decision of the circuit court, and its January 13, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: November 15, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

**DISSENTING:**

Justice William R. Wooton

6

Wooton, J., dissenting:

I disagree with the majority's affirmance of this case in a memorandum decision; I would have set the matter for oral argument to better address whether the circuit court erred in denying petitioners grandmother and step-grandfather permanent placement of the children. Petitioners argue that the circuit court abused its discretion by denying their motion for permanent placement, and by accepting the Department of Health and Human Resources' ("DHHR") determination that they failed a home study. Because I question whether the evidence offered by the DHHR supported the circuit court's decision, I respectfully dissent.

During the proceedings below, one witness testified that background checks run on petitioners showed that petitioner grandmother had a prior Child Protective Services ("CPS") "hit" in the State of Florida. However, the witness had no information regarding the nature of the alleged CPS history. Further, the witness stated that the background check showed that petitioner step-grandfather had previously been convicted of DUI causing death. Significantly, both the guardian ad litem ("guardian") and the circuit court made statements about the extent of petitioner step-grandfather's rehabilitation following his conviction. Because of the lack of evidence surrounding the CPS history in Florida and petitioner step-grandfather's noted rehabilitation following his conviction, this Court should have placed this case on the docket to more thoroughly consider whether sufficient evidence existed to deny petitioners permanent placement of the children.

. For all the foregoing reasons, I respectfully dissent.